**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| MARTIN BERG<br>***Plaintiff***,<br>v.<br>EMORY UNIVERSITY;<br>GREGORY FENVES, Chancellor, in his individual and official capacities;<br>PAUL MERRITT, in his individual capacity;<br>JOHN DOE 1, in his individual capacity and<br>BETH WALSH, in her individual capacity,<br>***Defendants***. | CASE NO.<br>JURY TRIAL DEMANDED |

**COMPLAINT FOR DAMAGES AND JURY DEMAND**

Martin Berg ("Plaintiff"), by and through his undersigned counsel, brings this Complaint against Emory University ("Emory"), Chancellor and then-President of Emory, Gregory Fenves, Paul Merritt, John Doe 1 (Atlanta Police Department officers), and Emory Police officer Beth Walsh (collectively, "Defendants"), and states as follows:

## I. INTRODUCTION

1. On April 25, 2024, Plaintiff, a third-year law student at Emory University School of Law, stood on a grassy area near, but not on, the Emory campus Quad, holding his cell phone and filming as police officers arrested students and faculty members around him. He was not part of the pro-Palestinian encampment. He had not been given a dispersal order. He had arrived on campus less than twenty minutes earlier. When he heard someone cry out that an officer had his "knee on her neck," Plaintiff moved to position himself to document whatever was happening. Atlanta Police Department officer Defendant Merritt pointed at Plaintiff and said, "he's going into

custody too." An unidentified officer, Defendant John Doe 1, immediately grabbed Plaintiff from his left side, pulled his hands behind his back, and zip-tied his wrists. Plaintiff was unlawfully arrested and detained for approximately thirty hours.

2. Plaintiff's arrest was the direct and foreseeable result of a decision made by Defendant Fenves, then-President of Emory University, to summon a joint police task force to campus and disperse a pro-Palestinian protest. Defendants Emory and Fenves reacted not because protesters were violent, but because Defendants Emory and Fenves disagreed with the student protesters' viewpoint: solidarity with the Palestinian people and outrage at Israel's military campaign in Gaza. Defendant Fenves made the decision to call police and forcibly remove protesters within ninety minutes of tents going up on the Quad, in violation of Emory's own policies requiring consultation and exhaustion of alternatives before any arrest.

3. Once Defendants Emory and Fenves called police to campus, Atlanta Police Defendants Merritt and John Doe 1 arrested Plaintiff in retaliation for his exercise of First Amendment rights to observe, document, and vocally criticize police conduct. Emory Police Defendant Walsh later signed Plaintiff's arrest warrant at the DeKalb County Jail.

4. As a direct result of this unlawful arrest, Plaintiff has suffered significant harm. The New York State Bar deferred his admission for nearly a year, delaying his ability to launch his legal career. As a proximate result of his arrest, he suffers from severe anxiety and claustrophobia from his detention at the DeKalb County Jail. In addition, his photograph appeared on signs posted around the Emory campus accusing him of antisemitism; websites called him a "leader of antisemitism at Emory" and accused him of endorsing Hamas.

5. This action seeks redress for Defendants' violations of Plaintiff's civil rights under federal and state law, including retaliation for protected speech in violation of the First Amendment, unlawful seizure in violation of the Fourth Amendment, and breach of contract.

## II. JURISDICTIONAL FACTS

### A. The Plaintiff

6. Plaintiff Martin Berg is a resident of Brooklyn, New York City, New York. At the time of the events giving rise to this Complaint, he was a third-year law student at Emory University School of Law in Atlanta, Georgia, days away from his last final exam and graduation.

### B. The Defendants

7. Defendant Emory University is a private university located in Atlanta, Georgia and is chartered by the State of Georgia.

8. Defendant Gregory Fenves is Chancellor of Emory University. At all times relevant to this Complaint he was the President of Emory University. He is sued in his individual capacity and official capacity as then-President of Emory University. He is sued under 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights committed while acting under color of state law.

9. Defendant Paul Merritt is sued in his individual capacity. At all times relevant to this Complaint, Defendant Merritt was a sworn police officer employed by the Atlanta Police Department. He is sued under 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights committed while acting under color of state law.

10. Defendant John Doe 1 is sued in his individual capacity. At all times relevant to this Complaint, the Defendant John Doe 1 was a sworn police officer employed by the Atlanta Police Department. Defendant John Doe 1 arrested Plaintiff upon orders from Defendant Merritt. Defendant John Doe 1 is sued under 42 U.S.C. § 1983 for violations of Plaintiff's constitutional

rights committed while acting under color of state law. Plaintiff will seek leave to amend this Complaint to substitute the true name of Defendant John Doe 1 once it is identified through discovery.

11. Defendant Beth Walsh is sued in her individual capacity. At all times relevant to this Complaint, Defendant Walsh was a sworn police officer employed by the Emory Police Department. Defendant Walsh participated in arresting Plaintiff by attesting to his arrest warrant and photographing Plaintiff at the DeKalb County Jail. Defendant Walsh is sued under 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights committed while acting under color of state law.

**C. Jurisdiction and Venue**

12. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case arises under federal law, namely the First and Fourth Amendments to the United States Constitution, as enforced through 42 U.S.C. § 1983.

13. All other claims fall under the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, as all other claims are so related to the claims under this Court's original jurisdiction that they form part of the same case or controversy.

14. The Northern District of Georgia is the proper venue pursuant to 28 U.S.C. § 1391(b)(2), as Defendant Emory is in unincorporated DeKalb County, which is within the district and divisional boundaries of the Atlanta Division of the Northern District of Georgia. The events giving rise to this complaint occurred within unincorporated DeKalb County and the City of Atlanta, both within the district and divisional boundaries of the Atlanta Division of the Northern District of Georgia.

15. The Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

## III. FACTUAL ALLEGATIONS

### A. Plaintiff's Presence on Campus, Protected Activity, and Unlawful Arrest

16. Plaintiff grew up in Illinois and attended Rice University, where he completed a double major in Engineering and Religious Studies. At Rice, Plaintiff founded the university's mock trial program. When he arrived at Emory University School of Law in the fall of 2021, he arrived intent on pursuing a career as a public defender, ensuring that people who could not afford representation receive the protections the Constitution promises them.

17. At Emory, Plaintiff pursued his goal with deliberation. In 2023, he was named a John Paul Stevens Fellow, an honor reserved for students whose summer work reflects a commitment to protecting democracy, the rule of law, and equal access to justice. Plaintiff spent his 1L summer working with the DeKalb County Public Defender's office and his 2L summer working with the Georgia Public Defender Council. In his second and third years, Plaintiff competed as a member of the Emory Law Mock Trial Society. In February 2024, Plaintiff and his team won the prestigious John L. Costello National Criminal Trial Advocacy Competition.

18. By April 25, 2024, Plaintiff was days away from his last final exam and graduation. He had spent three years building toward a career in the courtroom defending the people police arrest. He would sit for the New York State Bar Examination that July and pass it. That morning he learned that police were detaining students on the Emory Quad. With the instinct of a future public defender, he resolved to go and see what was happening.

19. Arriving on Emory's campus and nearing the Quad, Plaintiff heard chants of "Free Palestine," "Let them go," and "shame." He joined in some of the chants.

20. Plaintiff positioned himself on South Kilgo Circle NE among a group of onlookers, near where prisoner transport vehicles were arriving. From this location, Plaintiff could observe at least five people in various states of distress being detained by multiple police officers.

21. Plaintiff did not step foot on the Quad itself. He remained on South Kilgo Circle NE and adjacent areas, including sidewalks and grassy areas that were not part of the Quad. He crossed no barriers or barricades. He heard no dispersal order given in his vicinity.

22. Plaintiff began filming police arresting people with his cell phone. As he filmed, he heard someone cry out: “his knee is on her neck.” Plaintiff’s immediate thought was of George Floyd, who was killed in 2020 when a Minneapolis police officer knelt on his neck.

23. Plaintiff looked around and saw no cameras were pointed at the person who had cried out. He was not going to watch a potentially serious injury or death happen in front of him without documenting it.

24. Plaintiff was holding his phone recording police conduct when Defendant Merritt pointed at Plaintiff and said, “he's going into custody too.”

25. An unidentified officer, Defendant John Doe 1, immediately grabbed Plaintiff from his left side and pulled his hands behind his back. Plaintiff complied with the officer's commands. The officer zip-tied Plaintiff’s hands behind his back.

26. While Plaintiff stood with his hands zip-tied behind his back, he observed three officers wrestling a young woman as they attempted to detain her. Plaintiff yelled, “Does she look like a threat to you? What is wrong with you?”

27. Plaintiff was detained at approximately 11:30 a.m. He had been on campus for ten to twenty minutes before his arrest.

28. At no time before his arrest did any police officer inform Plaintiff that he was trespassing, that he needed to leave, or that he would be subject to arrest if he did not leave.

29. At no time before his arrest did Plaintiff engage in any violence, destruction of property, or conduct that would constitute disorderly conduct or any other criminal offense.

30. Officers placed Plaintiff, hands zip-tied behind his back, in the back of a prisoner transport van with two other detainees.

31. Soon after being placed in the van, Plaintiff felt the edge of the tie pinching his wrist below the palm of his left hand, close to his thumb. By the time the zip ties were removed at the jail, Plaintiff had little feeling in his left thumb.

32. Plaintiff has never recovered full feeling in his left thumb and continues to experience permanent symptoms of tingling and numbness in his thumb.

33. At the DeKalb County Jail, officers informed Plaintiff that he had been charged with disorderly conduct.

34. Eventually, Plaintiff was placed in a pod with four other arrestees from the Emory protest.

35. Guards at the jail referred to Plaintiff and the other detainees as the protesters. One guard said to another detainee, “You’re not going to protest again after this, huh?”

36. At approximately 3:00 a.m. the next morning, officers woke up Plaintiff and the other protesters. A jail worker informed Plaintiff that his charge had been changed from disorderly conduct to criminal trespass. Plaintiff was released after thirty hours in the DeKalb County Jail.

### B. Defendants Emory and Fenves’ Decision to Suppress the Pro-Palestinian Protest with Immediate Force

37. Plaintiff arrived on Emory’s campus on April 25, 2024, in the middle of a confrontation that had been building since before eight o'clock that morning. Students began

setting up tents at 7:40 a.m. on Emory's Quad, establishing an encampment in protest of Israel's military campaign in Gaza.

38. Rather than engage with protesters or allow the protest to proceed peacefully, Defendant Fenves decided to immediately call the Emory Police and instruct them in turn to call outside police agencies to forcibly remove protesters and dismantle the encampment.

39. Defendant Fenves informed Vice President Cheryl Elliot of his decision, who in turn alerted the Emory Police.

40. Defendant Fenves also spoke to Senior Vice President and Dean of Campus Life Enku Gelaye and asked Dean Gelaye to inform the Chair of the Open Expression Committee that the decision had been made to deploy police against the protesters.

41. Defendant Fenves did not consult with the Chair of the Open Expression Committee as he had already made the decision to deploy police against the protesters.

42. At approximately 9:00 a.m., the Emory Police gave several dispersal orders to the protesters to leave the Quad.

43. Simultaneously, the Emory Police called on the Atlanta Police Department for assistance. Together, the Emory Police and the Atlanta Police Department established a joint incident command with the goal of removing the encampment.

44. When Defendant Emory officials called police to campus, protesters had not engaged in any conduct justifying the use of force or mass arrests.

45. Associate Professor of Religion Ellen Gough described the protesters as peaceful, drinking coffee, eating snacks, chanting on the lawn, and "absolutely non-violent."

46. Members of the Atlanta Police Department, Georgia State Patrol, and Georgia Motor Carrier Compliance Division soon arrived on Emory's campus.

47. At approximately 10:30 a.m., Atlanta Police Department and Georgia State Patrol officers began arresting students, faculty, and other individuals who were present on the Quad.

48. When the arrests started, a sizeable group of students and faculty members had just exited academic buildings adjacent to the Quad, had been there for less than five minutes to observe the protesters, and had not heard the dispersal orders.

49. Other protesters had started to leave the Quad and were walking away when Atlanta Police Department officers attacked them and dragged them down.

50. Georgia State Patrol officer Sgt. McAdams fired ten rounds of pepperball ammunition to disperse the crowd from the encampment, hitting many students in their legs or faces.

51. Professor Noelle McAfee, Chair of the Department of Philosophy, refused to walk away as two or three officers pummeled a young female student on the Quad. Officers arrested Professor McAfee.

52. During the arrests, three officers tased one protester four times. They first applied pressure point tactics and then tased him with four five-second stun cycles to his right shoulder, right abdomen, and right thigh.

53. Police arrested twenty-eight individuals in total. Twenty-four were members of the Emory community: students, graduate students, or faculty. Three were university professors.

54. Local and national media outlets reported on the arrests. Video footage released to the public, including Atlanta Police Department officers' body camera footage, shows officers using force against protesters and observers.

55. Prosecutors ultimately dropped charges against twenty-one of the twenty-eight arrestees or offered them diversion programs.

56. During the 2023-2024 academic year, Emory's campus and its affiliated Oxford campus saw more than seventy peaceful protests, vigils, and gatherings that engaged the university's Open Expression Observers. None experienced this level of immediate police use of force.

57. A year earlier, on April 24, 2023, an Emory Stop Cop City student group set up an encampment on the Quad protesting construction of the Atlanta Public Safety Training Center. The Division of Campus Life engaged the group for most of the day to find an alternative place for the protest. At close to midnight, the Division of Campus Life consulted with Emory's Committee for Open Expression before transferring authority to Emory Police to end the event. Emory Police requested the help of Atlanta police. The protest eventually ended peacefully after about 1:30 am on April 25, 2023. No arrests were made and no physical altercations were reported.

58. The contrast with Emory's April 25, 2024, pro-Palestine protests could not be starker. When students protested Cop City, the Division of Campus Life engaged with the student group for most of the day before calling police. It consulted with Emory's Committee for Open Expression before transferring authority. No arrests were made. But, when students protested Israel's military campaign in Gaza, Defendants Emory and Fenves called police within roughly ninety minutes of tents going up, without consulting the Open Expression Committee, without offering an alternative location, and without any destruction of property or violence by protesters to justify it.

**C. Defendants Emory and Fenves' Violations of Emory's Open Expression Policy**

59. Defendants Emory and Fenves failed to follow their own policies and procedures when they called police and forcibly removed peaceful protesters from the Quad.

60. "Emory's Respect for Open Expression" (the "Open Expression Policy"), last revised on September 21, 2018, protected free speech and expression on Emory's campus and prohibited Emory officials from suppressing speech based on viewpoint or content.

61. The Open Expression Policy stated in § 8.14.2 that "[t]his Policy is paramount to other Emory policies that may conflict, except those grounded expressly in local, state, or national law."

62. Emory's Open Expression Policy was unambiguous: any arrest "must be the option of last resort," and the Chair of the Open Expression Committee "must be consulted and must have advised the University of all alternatives to support continuation of the expression, protest, or dissent before there is any termination or arrest." The Open Expression Policy, § 8.14.7.3. The Open Expression Policy further stated that except in emergencies, defined as situations involving "imminent serious bodily harm," "serious threat," "imminent life-threatening behavior," "reckless disregard for human life," or "threat to life, limb, or property," the Dean of Campus Life's authority could not be delegated to the Emory Police Department. *Id*. § 8.14.7.31. No such emergency existed on the morning of April 25, 2024.

63. The Open Expression Policy § 8.14.1.1 states that "[a]lthough as a private institution, Emory is not bound by the First Amendment to the United States Constitution, Emory nonetheless respects the protections and principles of free speech and assembly as set forth in the First Amendment (and the corresponding sections of the Georgia Constitution)."

64. The Open Expression Policy § 8.14.2.6 states that "[i]t is the intent of this Policy to provide opportunities for impromptu activities that occur without a reservation, especially in areas that are well suited to such activities and that have traditionally been used for such activities, for example, outdoor spaces on campus. If protestors or the organizers of an event want to use an

area where such activities are prohibited, the University administration shall make reasonable efforts to accommodate such activities in an alternate location nearby."

65. The Open Expression Policy stated that "the Committee for Open Expression should be consulted whenever possible before determining that members of the Community are indeed violating the principles of this Policy." Section 8.14.5.3.

66. It further stated that "[t]ermination of an event or any arrests must be the option of last resort. The Chair of the Committee for Open Expression, or their designee, must be consulted and must have advised the University of all alternatives to support continuation of the expression, protest, or dissent before there is any termination or arrest." *Id.* § 8.14.7.3.

67. It continued: "[a]voidance of injury to persons by the continuation of a meeting, event, or protest is a key factor in determining whether it should be forcibly terminated." *Id.*

68. Finally, it stated: "[e]xcept in emergencies, the Dean of Campus Life's authority under these Guidelines shall not be delegated to employees of the Emory Police Department." Emergencies are defined as "situations that include any of the following: imminent serious bodily harm; serious threat; imminent life-threatening behavior; reckless disregard for human life; or threat to life, limb, or property." *Id*. § 8.14.7.1.

69. Defendants Emory and Fenves violated the Open Expression Policy in two ways. First, they called police to suppress a protest based on its viewpoint, pro-Palestinian speech, without first consulting the Open Expression Committee or seeking alternatives that would have permitted the protest to continue. Second, they delegated authority to the Emory Police without any emergency—no imminent harm, no serious threat, no threat to life or property—to justify bypassing the Open Expression Policy's provisions.

70. Defendant Walsh represented Defendant Emory at the DeKalb County Jail. She signed Plaintiff's arrest warrant for the crime of criminal trespass and photographed Plaintiff and other arrestees on her cell phone.

71. Defendant Walsh's presence at the jail and her signing of Plaintiff's arrest warrant demonstrates that Defendant Emory was directly involved in the decision to arrest Plaintiff and other observers, and that Defendant Emory exercised control over the arrest process.

### D. Defendants Emory and Fenves' Failure to Respond to a Rise in Anti-Palestinian Harassment

72. Defendants Emory and Fenves' decision to immediately suppress the pro-Palestinian protest did not occur in a vacuum. In the months leading up to April 25, 2024, Emory had become a campus where students who expressed support for Palestinian rights faced harassment, institutional indifference, and in some cases, active hostility from university administrators. Individual students reported these incidents to Emory via the University's bias reporting process and in meetings. The Georgia chapter of the Council on American-Islamic Relations ("CAIR-Georgia") and Palestine Legal brought these issues to the attention of Defendants Emory and Fenves via a January 24, 2024 letter.

73. After Defendants Emory and Fenves refused to act, CAIR-Georgia and Palestine Legal filed a Title VI complaint against Emory with the U.S. Department of Education's Office for Civil Rights ("OCR") on April 5, 2024, alleging that Emory allowed a hostile environment to persist on its campus and actively fostered discrimination against Palestinians and their allies. These conditions, and Emory's discriminatory response to them, set the context for the events of April 25, 2024. The Title VI Complaint documented a pattern of anti-Palestinian harassment at Emory across more than a year.

74. On October 16, 2023, a Muslim student reported to Emory that while walking to the campus shuttles she heard students joking that "They keep saying we need to kill all the Palestinians."

75. That same month an Emory student posted on X, accusing students associated with Justice for Palestine who chanted "From the River to the Sea, Palestine Will be Free" of being "militant students calling for genocide of Jews from the river to the sea."

76. On October 26, 2023, an Emory student posted a question on an anonymous social media platform used by Emory students, known as Fizz, that threatened physical harm against supporters of Palestinian rights on campus. The post said, "Will I get in trouble if I fist fight anyone with a pro Palestine sign on campus?"

77. A student of Arab descent reported a fellow student asked her "Are you a terrorist? I think all brown people are terrorists." He then said, "Everything I say is not sarcastic. I'm not joking."

78. The harassment did not abate and the conflict in Gaza escalated. On February 29, 2024, Israeli forces opened fire while Palestinians were seeking food from aid trucks on Al-Rashid Street, killing 118 people and injuring 760. Known as the Flour Massacre, it was the deadliest mass casualty event since Israel invaded the Gaza Strip. The next day, a Palestinian student walked back to her dorm from the Emory chapel wearing her hijab and a mini keffiyeh (Palestinian scarf). Four male students behind her spoke loudly about their love for the Israeli army and the "work" it was doing.

79. The student said that she, as a Palestinian student, could not feel safe at Emory while other students openly harassed her as she watched "[her] people die every day."

80. Emory organizations also failed to apply institutional policies equally to pro-Palestinian student groups.

81. On October 12, 2023, Dean Andrea Hershatter, a dean of Emory's business school, told students that when they say "Free Palestine" they are associating themselves with terrorism.

82. In October 2023, the Emory College Instagram account deleted a statement by Palestinian students lamenting Palestinian lives lost after only a few hours and refused to post a Vigil for Palestine flyer.

83. In November 2023, an Emory parent at a bake sale, a fundraiser for the Palestinian Children's Relief Fund, accused a Muslim student of supporting Hamas. When the student asked Emory staff to intervene, they declined, citing Emory's Open Expression Policy as protection for the harasser's speech.

84. In February 2024, Emory informed Students for Justice in Palestine, who were planning "A Memorial for Palestine" event, that a "no-staking" policy prohibited them from staking signs on the campus. But other university offices often staked signs in the ground.

85. Students, CAIR-Georgia, and Palestine Legal reported these incidents to Defendants Emory and Fenves directly. Students reported them via Emory's bias reporting system. Students met with Defendant Fenves on October 27, 2023. CAIR-Georgia and Palestine Legal sent Defendants Emory and Fenves a letter on January 24, 2024. Students held a February 12, 2024 meeting with Defendant Fenves. Finally, on April 5, 2024, CAIR-Georgia and Palestine Legal filed a formal Title VI Complaint with the U.S. Department of Education's OCR.

86. Defendant Fenves declined to apologize for Emory's response to any of the incidents. Defendant Fenves declined to release a statement affirming the safety of Emory's Palestinian students.

87. A further incident after the protests illustrates Defendant Emory's discriminatory policies towards pro-Palestinian students. Emory suspended Umaymah Mohammad, a Palestinian-American and MD/PhD student at Emory, after she appeared on *Democracy Now!* on April 26, 2024 to speak about the pro-Palestine student encampments across the United States. The suspension cost Ms. Mohammad her scholarship and stipend for a year and threatened her with expulsion from the medical training she had been working toward for fifteen years.

88. In a September 23, 2024 report, the Committee for Open Expression reviewed Ms. Mohammad's statements and concluded that her speech was protected by Emory's Open Expression Policy. It further concluded that the School of Medicine violated the Open Expression Policy by proceeding with sanctions against Ms. Mohammad and recommended that the charges be dropped.

89. On August 8, 2025, Ms. Mohammad filed a federal lawsuit alleging violations of her civil rights.

**E. The Criminal Charges and the Injuries and Damages Caused to Plaintiff**

90. The criminal charges against Plaintiff were eventually dismissed as part of a pre-trial diversion agreement, but not before they had remained pending for approximately a year. During this time Plaintiff could not be admitted to practice law in New York.

91. Plaintiff passed the New York State Bar Examination in July 2024. However, his admission to the New York State Bar was deferred pending the resolution of the criminal charges against him.

92. Plaintiff had to find employment in a non-attorney position that did not require bar admission and at a lower salary than the bar-licensed positions his three years at Emory had prepared him for.

93. Since his arrest and detention, Plaintiff has suffered psychological harm, including anxiety, claustrophobia, and post-traumatic stress.

94. Plaintiff has become fearful of small, enclosed spaces. He often cannot remain in small, windowless rooms because his heart races and he experiences symptoms of a panic attack.

95. Plaintiff felt abandoned by his law school and his university.

96. In addition to psychological harm, Plaintiff has been subjected to public harassment and defamation. Someone went to Emory's campus and posted signs with his photograph around campus, accusing him of being antisemitism. Multiple websites accused Plaintiff of being a "leader of antisemitism at Emory," of "endorsing Hamas," and that he was at a "Hamas endorsed protest."

97. These false accusations have further harmed Plaintiff's reputation and have caused him significant emotional distress.

## CLAIMS

### COUNT I
### First Amendment Viewpoint Discrimination
### 42 U.S.C. § 1983
### Against Defendants Emory University and Gregory Fenves, in his individual and official capacities

98. In violation of the First Amendment's ban on viewpoint discrimination, Defendants Emory and Fenves are liable under 42 U.S.C. § 1983 for ordering that the April 25, 2024, pro-Palestine student protest at Emory be canceled and the protestors be dispersed at the hands of a joint task force between the Atlanta and Emory Police Departments.

99. Emory's campus saw more than seventy peaceful protests and vigils during the 2023-2024 academic year. Defendants Emory and Fenves summoned a joint police task force to immediately arrest students against exactly one. Defendants Emory and Fenves targeted the April

25, 2024 pro-Palestine protest because of their animus towards its viewpoint. *See* ¶¶ 41, 56-58, 72-89.

100. By orchestrating a coordinated plan to use the Atlanta Police Department as part of a joint task force with the Emory Police, Defendants Emory and Fenves were state actors and their challenged conduct was under color of law. *See* ¶¶ 38-43, 46-47.

101. Defendant Fenves was the official policymaker for Defendant Emory when he ordered the police to disperse the April 25, 2024, protest. His order was not subject to further review and it constituted a final policy of Defendant Emory under *Monell*.

102. As a result of the unconstitutional decision to use police to cancel and disperse the April 25, 2024, protest, Plaintiff's speech was chilled and he was arrested and suffered the injuries described above.

**COUNT II**
**First Amendment Retaliation**
**42 U.S.C. § 1983**
**Against Defendants Paul Merritt, John Doe 1, and Beth Walsh in Their Individual Capacities**

103. On April 25, 2024, Plaintiff engaged in constitutionally protected First Amendment activity by observing a newsworthy protest, filming police conduct, chanting political slogans including "Free Palestine" and "Let them go," and expressing verbal criticism of police actions.

104. Plaintiff's specific protected activities included: (a) observing and documenting police conduct during the protest using his cell phone; (b) expressing verbal support for protesters by joining in chants; and (c) expressing criticism of police conduct by yelling at officers who were using force against a young woman. *See* ¶¶ 19-26.

105. Plaintiff's conduct constituted protected speech under the First Amendment, as he was observing a newsworthy event, chanting political slogans, and filming police conduct—all activities entitled to the highest level of First Amendment protection. *Id*.

106. Defendant Merritt ordered Plaintiff's arrest by pointing at him and stating words to the effect of "he's going into custody too." *See* ¶ 24.

107. Defendant John Doe 1 followed Defendant Merritt's orders and zip-tied Plaintiff's hands behind his back. *See* ¶¶ 25-26.

108. Defendant Walsh signed Plaintiff's arrest warrant for the crime of criminal trespass at the DeKalb County Jail. *See* ¶ 70.

109. The arrest of Plaintiff constitutes an adverse action that would deter a person of ordinary firmness from continuing to engage in protected First Amendment conduct.

110. Defendants Merritt, John Doe 1, and Walsh's decision to arrest Plaintiff was made in direct retaliation for Plaintiff's exercise of his First Amendment rights to observe, document, and express concern about police conduct during the protest. *See* ¶¶ 19-26.

111. The retaliatory motive of Defendants Merritt and John Doe is further established by the lack of any probable cause to arrest Plaintiff, *see infra* Count III, and by the objective comparator evidence that other spectators standing near Plaintiff were not targeted for arrest.

112. As a direct and proximate result of Defendants' violation of his First Amendment rights Plaintiff suffered damages. *See* ¶¶ 4, 31-32, 90-97.

**COUNT III**
**Fourth Amendment – Unreasonable Seizure**
**(False Arrest)**
**42 U.S.C. § 1983**
**Against Defendants Paul Merritt and John Doe 1 in Their Individual Capacities**

113. On April 25, 2024, at approximately 11:30 a.m., Defendants Merritt and John Doe 1, arrested Plaintiff without probable cause. *See* ¶¶ 20-21, 24-25, 28-29.

114. Defendant Merritt ordered Plaintiff's arrest by pointing at him and stating words to the effect of "he's going into custody too." *See* ¶ 24.

115. Defendant John Doe 1 executed the arrest by grabbing Plaintiff, pulling his hands behind his back, removing his backpack, and placing him in zip-tie restraints. *See* ¶ 25.

116. At the time of his arrest, Plaintiff was not on the Quad from which protestors were ordered to disperse. *See* ¶¶ 20-21.

117. Plaintiff did not receive any dispersal order or warning before his arrest. *See* ¶¶ 20-21, 28.

118. Defendants Merritt and John Doe 1 had no reason to believe Plaintiff had received any order to disperse. He was not on the Quad. He was on South Kilgo Circle NE, where no dispersal order had been given.

119. At no time before his arrest did Plaintiff engage in any violence, destruction of property, or conduct that would constitute disorderly conduct or any other criminal offense. *See* ¶ 29.

120. Defendants Merritt and John Doe 1 lacked probable cause to arrest Plaintiff, as no reasonable officer could have believed he was committing any offense at the time of his arrest.

121. Defendants' arrest of Plaintiff without probable cause violated his clearly established constitutional rights under the Fourth Amendment.

122. As a direct and proximate result of Defendants' violation of his Fourth Amendment rights, Plaintiff suffered damages.

**COUNT IV**
**Fourth Amendment – Unreasonable Seizure**
**(Malicious Prosecution)**
**42 U.S.C. § 1983**
**Against Defendant Beth Walsh in her Individual Capacity**

123. At the time of his arrest, Plaintiff was standing on South Kilgo Circle NE, outside the Quad, in an area to which no dispersal order had been given. *See* ¶¶ 20-21, 42.

124. Plaintiff did not receive any dispersal order or warning before his arrest. *See* ¶¶ 21, 28.

125. Defendant Walsh signed Plaintiff's arrest warrant for the crime of criminal trespass at the DeKalb County Jail. *See* ¶ 70.

126. Defendant Walsh lacked any reason to believe that Emory or Atlanta Police gave Plaintiff an order to disperse from where he was positioned, outside the Quad.

127. Defendant Walsh lacked probable cause to believe Plaintiff had committed a trespass, as no reasonable officer could have believed he was trespassing at the time of his arrest.

128. The prosecution of Plaintiff ended in a pretrial diversion, a favorable termination of the proceedings.

129. Defendant Walsh's signing an arrest warrant against Plaintiff without probable cause violated his clearly established constitutional rights under the Fourth Amendment.

130. As a direct and proximate result of Defendant Walsh's violation of his Fourth Amendment rights, Plaintiff suffered damages.

**Count V**
**Breach of Contract**
**In Violation of Georgia Law**
**Against Defendant Emory University**

131. Plaintiff and Defendant Emory University formed a binding contractual relationship upon his enrollment as a third-year law student at Emory University School of Law.

132. Plaintiff was an Emory student who complied with the material terms of his contract with Defendant Emory, by, for example, paying tuition and fees; participating in Defendant Emory's education programs and activities; complying with the codes of conduct; and completing coursework at the law school in pursuit of his J.D. degree.

133. Defendant Emory agreed to provide Plaintiff with a legal education consistent with ABA accreditation requirements and to abide by the terms of various publications, including university catalogs, student manuals, student handbooks, websites, policy manuals, and other university policies and procedures, including Emory's Open Expression Policy.

134. Defendant Emory's student handbook, policies, and the Open Expression Policy constitute an implied contract between Defendant Emory and its students.

135. Under Georgia law, student handbooks and university policies can form the basis of an implied contract, and university policies and handbooks constitute enforceable contractual terms. *Kuritzky v. Emory Univ*., 294 Ga. App. 370, 371, 669 S.E.2d 179, 181 (2008) ("Georgia law permits an expelled student to bring a breach of contract action against a private educational institution for failure to abide by the hearing procedures set forth in the student handbook."); (quoting *Morehouse College v. McGaha*, 277 Ga.App. 529, 627 S.E.2d 39 (2005)).

136. Moreover, Defendant Emory's ABA accreditation, pursuant to ABA Standard 509, requires that "[a]ll information that [the University] reports, publicizes, or distributes […] be complete, accurate and not misleading to a reasonable law school student or applicant."

137. At the time of the events giving rise to this Complaint, Defendant Emory had in effect the Open Expression Policy, last revised on September 21, 2018. *See* ¶ 60.

138. The Open Expression Policy stated in § 8.14.2 that "[t]his Policy is paramount to other Emory policies that may conflict, except those grounded expressly in local, state, or national law." *See* ¶ 61.

139. The Open Expression Policy was designed to protect free speech and expression on Emory's campus in line with the First Amendment and to ensure that Emory officials did not suppress speech based on its viewpoint or content. *See* ¶ 63.

140. The Open Expression Policy § 8.14.2.6 stated that "[i]t is the intent of this Policy to provide opportunities for impromptu activities that occur without a reservation, especially in areas that are well suited to such activities and that have traditionally been used for such activities, for example, outdoor spaces on campus. If protestors or the organizers of an event want to use an area where such activities are prohibited, the University administration shall make reasonable efforts to accommodate such activities in an alternate location nearby." *See* ¶ 64.

141. It further stated that "[t]ermination of an event or any arrests must be the option of last resort. The Chair of the Committee for Open Expression, or their designee, must be consulted and must have advised the University of all alternatives to support continuation of the expression, protest, or dissent before there is any termination or arrest." *See* ¶ 66.

142. Defendant Emory breached its contractual obligations to Plaintiff by violating the Open Expression Policy by: (a) calling police to suppress protected speech based on its viewpoint (pro-Palestinian) without first consulting the Open Expression Committee or seeking alternatives and (b) delegating authority to the Emory Police without any emergency to justify doing so.

Defendant Emory failed to afford Plaintiff the protections guaranteed by the Open Expression Policy. *See* ¶¶ 59-69.

143. If Defendant Emory had honored its contractual obligations to Plaintiff then it would not have directed the arrest of protestors and it would have accommodated the protestors at a nearby location. In either case, Plaintiff would not have been subject to arrest.

144. Defendant Emory officials made the decision to call police to campus on April 25, 2024, to forcibly remove protesters and observers from the Quad after observing the protesters for approximately two hours. *See* ¶¶ 38-47.

145. At the time Defendant Emory officials called police, the protesters and observers, including Plaintiff, were engaged in peaceful, constitutionally protected speech and assembly and had not engaged in any violence, destruction of property, or other conduct that would justify the use of force or mass arrests. *See* ¶¶ 44-45.

146. Defendant Emory officials reacted to the April 25, 2024 protest with a level of immediate police response that was distinct from any campus protest or vigil during that academic year, or in recent memory.

147. Defendant Emory officials' communications and Emory Police dispersal orders did not leave open an alternative location for protesters to continue their advocacy.

148. Defendant Emory's immediate call to the police demonstrates that police arrests were used as a first rather than last response to the protest.

149. Defendant Fenves failed to consult the Chair of the Committee for Open Expression, or their designee before resorting to calling the police.

150. Defendant Walsh's presence at the jail and her participation in the preparation of arrest paperwork demonstrates that Emory directly sanctioned the decision to arrest Plaintiff and other observers, and that Emory exercised control over the arrest process. *See* ¶¶ 70-71.

151. Defendant Emory's breach of the Open Expression Policy and its failure to follow its own policies regarding calling police to terminate protests constitute material breaches of the contractual relationship between Defendant Emory and Plaintiff.

152. As a direct and proximate result of Defendant Emory's breach of contract, Plaintiff has suffered and continues to suffer damages.

**COUNT VI**
**Negligence**
**In Violation of Georgia Law**
**Against Defendant Emory University**

153. Defendant Emory University owed a duty of care to Plaintiff as a student enrolled at Emory University School of Law.

154. This duty included the obligation to exercise reasonable care in: (a) ensuring that police was not called to suppress protected speech and viewpoint-based expression and (b) following its own procedures before subjecting students to the risk of arrest.

155. Defendant Emory breached its duty of care to Plaintiff by calling police to campus for the purpose of suppressing protected speech on April 25, 2024 and failing to follow its own procedures for handling protests and demonstrations, such as consulting the Chair of the Committee for Open Expression, or their designee and seek alternatives to support continuation of the protest before resorting to police. In turn, these breaches of duty foreseeably caused Plaintiff to be unlawfully arrested.

156. Defendant Emory officials made the decision to call police to campus on April 25, 2024, to forcibly remove protesters and observers who were engaged in peaceful, constitutionally protected activity. *See* ¶¶ 37-47.

157. At the time Defendant Emory called police there was no legitimate basis for doing so, as the protesters were peaceful and had not engaged in any conduct that would justify police intervention or mass arrests. *See* ¶¶ 44-45.

158. Defendant Emory failed to exercise reasonable care in calling police and failed to follow the safeguards imposed by its own policy, such as seeking alternatives before resorting to calling police, and thus failed to protect students like Plaintiff from unlawful arrest.

159. Defendant Emory's negligent decision to call police to suppress protected speech was a proximate cause of Plaintiff's unlawful arrest and the resulting injuries.

**PRAYER FOR RELIEF**

160. WHEREFORE, Plaintiff respectfully requests that this Court:

a. Enter judgment in favor of Plaintiff and against Defendants on all counts;

b. Award Plaintiff compensatory damages in an amount to be determined at trial, including but not limited to:

i. Compensatory damages for lost income and economic damages

ii. Damages for emotional distress, pain and suffering, and mental anguish

iii. Damages for injury to reputation

iv. Damages for physical injury

v. Damages for the violation of Plaintiff's constitutional rights

c. Award Plaintiff punitive damages against Defendants in an amount sufficient to punish and deter the violation of constitutional rights;

d. Enter declaratory judgment that:

i. Defendants violated Plaintiff's rights under the First Amendment to the United States Constitution;

ii. Defendants violated Plaintiff's rights under the Fourth Amendment to the United States Constitution;

iii. Defendant Emory University violated its contractual obligations to Plaintiff;

iv. Defendants violated Georgia state law;

e. any and all other damages, which will be more fully proven at trial, including for the intangible but concrete harms proximately caused by the violations of Plaintiff's rights under the First and Fourth Amendments and Georgia State law;

f. all other forms of relief provided by law together with interest from the date of injury until paid, plus costs of these proceedings.

161. Plaintiff is entitled to attorneys' fees under 42 U.S.C. § 1988, prejudgment interest, and costs.

162. All defendants are liable jointly, severally, and in solido as a result of their participation in the conduct giving rise to these allegations.

163. Plaintiff demands a jury trial.

Respectfully submitted, this 9th day of April, 2026.

/s/ *Andrew Menefee*
Andrew Menefee
Menefee Law
Georgia Bar No. 404627

P.O. Box 6134
Montgomery, AL 36106
(202) 381-0143
amenefee@menefee-law.com

/s/ *Katherine Cantolina*
Katherine Cantolina
The Workers Firm LLC
7000 Central Parkway,
Suite 1100, Office 23,
Atlanta, GA 30328
(404) 382-9660
Kate@theworkersfirm.com

*Attorneys for Plaintiff*

.